United States District Court
Southern District of Texas
**ENTERED**
September 30, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RICHARD O. GONZALES, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:24-CV-00001 |
| | § | |
| CHIEF SINTON POLICE DEPARTMENT, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Richard O. Gonzales, a Texas pretrial detainee appearing *pro se* and *in forma pauperis*, filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983, alleging excessive force during his arrest by Sinton, Texas police officers. (Doc. No. 1.) Pending before the Court is the defendants' motion to dismiss this case based on qualified immunity. (Doc. No. 22.) The undersigned treats the defendants' motion as one for summary judgment and recommends that it be GRANTED and that Plaintiff's lawsuit be DISMISSED.

### A. *Jurisdiction.*

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. This case has been referred to the undersigned magistrate judge for case management and recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

### B. *Proceedings.*

Plaintiff filed this suit, alleging that that defendants Phillip Hernandez ("Officer Hernandez") and Rendy Rodriguez ("Officer Rodriguez"), both police officers in Sinton, Texas, used excessive force while arresting him. (Doc. No. 1.) He also alleged excessive force by an

intake officer at the San Patricio County Jail and medical neglect by the jail's medical staff.  *See id.*

Pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(c), 28 U.S.C. § 1915A, the undersigned screened Plaintiff's case.  After receiving and reviewing Plaintiff's responses to the Court's questionnaire (Doc. Nos. 7, 10), the undersigned recommended that the district court retain only Plaintiff's excessive force claims against Officers Hernandez and Rodriguez in their individual capacities and dismiss his remaining claims against the other defendants.  (Doc. No. 11.)  The district court adopted this recommendation.  (Doc. No. 19.)

The Court ordered service of process on Officers Hernandez and Rodriguez.  (Doc. No. 12.)  Both defendants answered Plaintiff's complaint and asserted qualified immunity.  *See* Doc. No. 20; *id*. at 7.  The Court ordered Officers Hernandez and Rodriguez to either file a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) or a motion for summary judgment, or alternatively to file an advisory stating that qualified immunity could not be determined through a dispositive motion without resolution of disputed factual matters.  (Doc. No. 21.)

Officers Hernandez and Rodriguez responded by filing a "motion to dismiss."  (Doc. No. 22.)  They supported their motion with surveillance video recordings of Plaintiff's arrest and transport to the San Patricio County Jail (Doc. No. 22-1), Plaintiff's arrest reports (Doc. Nos. 22-2, 22-5), and affidavits from Officers Hernandez and Rodriguez (Doc. Nos. 22-3, 22-4).  Plaintiff did not respond to the motion.

### C.  *Plaintiff's allegations, legal claim, and requested relief.*

As recounted in the undersigned's memorandum and recommendation, Plaintiff alleges that he was arrested by Sinton police officers on August 1, 2023.  (Doc. No. 1, p. 4; Doc. No. 10,

p. 3 ¶ 9(e).)  Officer Hernandez arrested Plaintiff in front of Plaintiff's sister's house for "walking in the middle of the road."  (Doc. No. 10, p. 2 ¶¶ 9(b), 9(c).)  Plaintiff resisted the arrest, believing that Officer Hernandez had no probable cause to search him.  *Id.* at 3 ¶ 9(d).  Plaintiff states that Officer Hernandez had assaulted Plaintiff on a previous occasion in September 2022; Plaintiff alleges that he told Officer Hernandez that the latter should call in another officer, because Plaintiff "didn't want him near me."  *Id.*  Plaintiff states: "As far as physical I just kept moving so he wouldn't put his hands on me cause I was in fear."  *Id.*

Plaintiff claims that Officer Hernandez allegedly assaulted him by "shoving" his shoulder, knee, and body weight into Plaintiff's spine.  (Doc. No. 10, p. 4 ¶ 9(g).)  Plaintiff protested that Officer Hernandez was hurting him, but Officer Hernandez "kept on throwing his weight" and instructing Plaintiff to put his hands behind his back.  *Id.* at 4-5 ¶ 9(g).  Plaintiff states that he could not put his hands behind his back, because his arm was pinned underneath him and because all of Officer Hernandez's weight was on top of him.  *Id.* at 5 ¶ 9(g).  After Plaintiff was finally handcuffed and searched, he was told to get up (Plaintiff does not state who gave him this direction), but refused, stating that his back hurt.  *Id.*  A deputy sheriff on the scene allegedly asked what was wrong with Plaintiff's back.  *Id.*  Officer Hernandez allegedly replied: "old spine injury" before the two allegedly "yanked" Plaintiff to his feet.  *Id.*[1]  Plaintiff states that when he was guided to the squad car Officer Hernandez "ran around to the passenger back door, and yanked me in the car by the handcuffs."  *Id.*

Plaintiff claims that Officer Rodriguez arrived at the scene of the arrest while Plaintiff was being searched.  (Doc. No. 10, p. 3 ¶ 9(f).)  Officer Hernandez found a bullet in Plaintiff's

---

[1] Plaintiff's submitted documentation reflects that he injured his back in a car accident a year prior to his arrest. (Doc. No. 10-2, p. 24.)  This may have been a suicide attempt.  *Id.* at 25.  Plaintiff stated that he was ejected from a car at 90 miles per hour.  *Id.* at 42.

pocket, and told Officer Rodriguez to cuff Plaintiff. *Id.* Plaintiff states that Officer Rodriguez grabbed his hand and cuffed it. *Id.* Plaintiff states what happened next: "As she was asking for my other hand I was still at it with [Officer] Hernandez. Officer Rodriguez kept yelling put your hand behind your back, but my arm was under me, and I had Officer Hernandez with all his weight pressed on me." *Id.* Plaintiff claims that on the way to the squad car he paused because he was hurting. *Id.* Officer Rodriguez allegedly responded by grabbing Plaintiff's throat. *Id.* at 4 ¶ 9(f). Plaintiff states that he remembered Officer Hernandez's alleged prior assault from September 2022 and became scared, and did not want to get into the squad car. *Id.* Plaintiff alleges that he put his leg in the squad car's rear wheel well so that the arresting officers could not get him into the car. *Id.* Plaintiff claims that he heard his sister yelling to the officers about Plaintiff's back, but that Officer Rodriguez yelled for Plaintiff's sister to stay back. *Id.* Plaintiff states: "It was there, and then that I felt Rendy Rodriguez['s] closed fist punch me in the back about three times. I still refused cause the way they were playing dirty made me begin to believe if I got in the car that they would have other intentions for me." *Id.* Plaintiff states that he was put into the back of the squad car without a seat belt, and that Officer Rodriguez "floored the gas pedal all the way to the county jail. At every stop sign she would slam on the brakes sending me flying off the seat I was laid across." *Id.*

Plaintiff claims that Officer Hernandez knew that Plaintiff had previously had back surgery. He states that Officer Hernandez had assaulted Plaintiff in September 2022, "and a detective told him I had surgery, so during the arrest I just kept yelling my back." (Doc. No. 10, p. 6 ¶ 11.) Plaintiff claims that his sister and his child's mother both advised "them" (presumably Plaintiff means Officer Hernandez and Officer Rodriguez) of Plaintiff's prior surgery. *Id.*

Asked what injuries he suffered from the arrest, Plaintiff states that he suffered bruising, spinal pain, and a "burst fracture in T-12." (Doc. No. 10, p. 6 ¶ 12.)[2] Plaintiff also claims that he has "a intervertebral disc desication" and "moderate to severe height loss at T-11 to T-12." *Id.* Plaintiff also claims that "there is mild mass effect on the spinal cord at T-11 to T-12 due to kyphotic deformity, T-12 retropulsion, and disc bulge." *Id.*

Plaintiff states that he did not file grievances against Officers Rodriguez or Hernandez because "the police department does not have a grievance office." (Doc. No. 10, p. 10 ¶ 37.) Plaintiff also states that he wrote to the judge in his state criminal case[3] and to the county sheriff, asking how to press charges against Officers Rodriguez and Hernandez, but that he received no response. *Id.* at 11 ¶ 39; *see also* Doc. No. 10-3, pp. 65-66.

After screening, the district court retained Plaintiff's claims of excessive force against Officers Hernandez and Rodriguez. Plaintiff requests monetary and injunctive relief. As monetary relief, Plaintiff seeks unspecified compensation for his medical expenses. (Doc. No. 10, p. 11.)[4]

### D. The defendants' motion.

In their motion to dismiss, Officers Hernandez and Rodriguez argue that they did not use excessive force and that Plaintiff's allegations amount only to simple assault by the officers.

---

[2] The undersigned construed "T-12" as referring to one of Plaintiff's vertebrae, the twelfth thoracic vertebra.

[3] Plaintiff states that he is under pending state criminal charges for forgery, theft of a firearm, possession of a firearm by a felon, resisting arrest, and evading arrest or detention with a vehicle. (Doc. No. 10, p. 1 ¶ 3(a); *see also* Doc. No. 10-2, p. 23) (booking report).

[4] Plaintiff also requested that the Court "approve recommended spinal surgery from spinal doctor Mathew Alexander." *See id.* That relief, however, stemmed from his dismissed claim of inadequate medical care by the jail's medical staff. Plaintiff further asked that criminal charges be brought against the "assaulting officer[s]" *see id.*, but there is no constitutional right to have someone criminally prosecuted. *See Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990).

(Doc. No. 22, pp. 5-6 ¶¶ 15-16.)  They argue that the physical force used was justified because Plaintiff was actively resisting the officers and that his admissions "establish that officer and civilian safety was at issue during his arrest."  *Id.* at 9-10 ¶¶ 23-25; *id.* at 12-13 ¶¶ 30-32. Officers Hernandez and Rodriguez also urge the Court to consider the video footage as demonstrating conclusively that no excessive force occurred.  *Id.* at 10-11 ¶¶ 26-28.

### E.  The submitted evidence.

The officers submitted evidence with their dismissal motion.  That evidence consists of the following:

- Officer Hernandez's body camera footage of Plaintiff's arrest (Doc. No. 22-1, Exhibit A);

- Officer Rodriguez's body camera footage of Plaintiff's arrest (Doc. No. 22-1, Exhibit B);

- Officer Hernandez's arrest report (Doc. No. 22-2);

- Officer Hernandez's affidavit (Doc. No. 22-3);

- Officer Rodriguez's affidavit  (Doc. No. 22-4);

- Officer Rodriguez's arrest report (Doc. No. 22-5);

- Video footage of the rear seat of Officer Rodriguez's patrol car, showing Plaintiff's transport after arrest (Doc. No. 22-1, Exhibit G); and

- Video footage of the dashboard of Officer Rodriguez's patrol car, showing Plaintiff's transport after arrest (Doc. No. 22-1, Exhibit H).

Plaintiff has not responded to the dismissal motion, so he has not contested any of the officers' submitted evidence.

### 1. *Officer Hernandez's affidavit.*

In his affidavit, Officer Hernandez states that his body camera video footage is accurate. (Doc. No. 22-3, p. 1 ¶ 2.)  He also authenticates his report of Plaintiff's arrest.  *Id.* at 2 ¶ 3; Doc. No. 22-2.

Officer Hernandez states that when he saw Plaintiff walking in the middle of the street – an act that Officer Hernandez states he knew was a violation of Texas law – he directed Plaintiff to come over to him so they could speak.  *Id.* at 2 ¶ 4.  Plaintiff "immediately became argumentative and angry," Officer Hernandez says, and told Officer Hernandez that he would not approach, and continued walking away from Officer Hernandez.  *Id.*  Even when initially stopped, Plaintiff's agitated state caused Officer Hernandez to ask Plaintiff to turn his pockets inside out, in case Plaintiff had any weapons: Plaintiff then produced a bullet from his pocket. *Id.*  "At that time," states Officer Hernandez, "I had reason to believe that he might have a firearm somewhere else on his person and ordered him to submit to a pat down."  *Id.*

Officer Hernandez states that Plaintiff was not cooperative when directed to submit to the pat down.  Plaintiff attempted to walk away, but Officer Hernandez "grabbed his arm and guided him to the front of Officer Rodriguez's patrol vehicle."  (Doc. No. 22-3, p. 2 ¶ 5.)  Plaintiff then "wrested his arm away from me and spun away from both of us.  He then began to walk briskly away from us again."  *Id.* ¶ 6.  Officer Hernandez states that he "was able to catch up with him and again grabbed ahold of the Plaintiff.  He continued to physically resist me and the two of us fell to the ground.  Once on the ground, Officer Rodriguez and I worked together to get handcuffs on the Plaintiff so he could be subjected to a pat down search."  *Id.*

Officer Hernandez then states that he was "forced to apply pressure to Plaintiff to pin him down while we attempted to handcuff him."  (Doc. No. 22-3, p. 3 ¶ 7.)  He relates that Plaintiff

refused to give the officers his hands in order to be cuffed, despite being asked multiple times to

do so.  *Id.*  Around this time, bystanders started to gather.  *Id.*  Plaintiff "physically resisted us

while on the ground and fought to keep his hands from being cuffed."  *Id.*  Officer Hernandez

then states:

> Due to the Plaintiff having already produced a bullet from his pocket, his actively
> and physically resisting arrest, and his argumentative and non-cooperative
> behavior all led me to believe that he could possess a firearm and that he posed a
> threat to myself, Officer Rodriguez, and bystanders gathering nearby.  The force
> used against the Plaintiff was in no way excessive, and it was necessary in order
> to effectuate his pat down and eventual arrest.

*Id.* ¶ 8.

Officer Hernandez states that he then found a firearm tucked into Plaintiff's waistband.

(Doc. No. 22-3, p. 3 ¶ 9.)  Other deputies (not Officer Hernandez or Rodriguez) pulled Plaintiff

to his feet after he refused to stand up.  *Id.*  Plaintiff, Officer Hernandez says, "continued to fight

to get away" as he was guided to the waiting patrol car.  *Id.*  "When Plaintiff tried to force his

way out of the deputies' control and away from the vehicle, I moved to help them push Plaintiff

into the vehicle.  One of the deputies moved around to pull him inside.  Once inside the vehicle, I

made sure that his feet were clear of the door before I shut it."  *Id.*  He adds: "I never once

punched Plaintiff and the body camera footage reflects this fact as well."  *Id.*

Officer Hernandez concludes that the quantum of force he used was reasonable because

Plaintiff actively and physically resisted being patted down for weapons and being handcuffed

and because he "continuously attempted to escape from me and Officer Rodriguez while we

attempted to perform the stop."  (Doc. No. 22-3, pp. 3-4 ¶ 11.)  The force he used to get Plaintiff

into the patrol car was also reasonable and only that which was necessary to overcome his

physical resistance, Officer Hernandez states.  *Id.* at 4 ¶ 11.

### 2. *Officer Rodriguez's affidavit.*

In her affidavit, Officer Rodriguez states that her body camera video footage is accurate. (Doc. No. 22-4, p. 1 ¶ 2.)  She also authenticates her report of Plaintiff's arrest.  *Id.* at 2 ¶ 3; Doc. No. 22-5.

Officer Rodriguez states that Officer Hernandez was already present she arrived at the arrest scene and that Plaintiff was already resisting Officer Hernandez's efforts to detain him. (Doc. No. 22-4, p. 2 ¶ 4.)  Having been told that Plaintiff had produced a bullet from his pocket, and observing that Plaintiff was actively and physically resisting arrest and being argumentative and non-cooperative, Officer Rodriguez concluded that Plaintiff might have possessed a firearm "and that he posed a threat to myself, Officer Hernandez, and bystanders gathering nearby."  *Id.* ¶¶ 4, 5.  She continues:

> I never once punched Plaintiff, much less multiple times as alleged in his complaint.  The video footage of the incident proves that Plaintiff was never once punched by me.  I also never grabbed the Plaintiff by the throat after putting on gloves as Plaintiff also alleges in his complaint; again, the video footage conclusively shows that Plaintiff's allegations are untrue.

*Id.* ¶ 6.  Officer Rodriguez also denies, again citing the video footage, that Plaintiff was ever jostled while being transported to the jail.  *Id.*

Officer Rodriguez concludes:

> Plaintiff actively and physically resisted both being patted down for weapons and being handcuffed.  He continuously attempted to escape from me and Officer Hernandez while we attempted to perform the stop.  He continuously refused to comply with the orders both myself and Officer Hernandez issued to him. Plaintiff was repeatedly asked to provide his hands to be cuffed and he repeatedly told us that he would not give us his hands.  Plaintiff was only on the ground for so long and with as much force as was necessary to handcuff him.  The amount of force used throughout the encounter was that which was reasonably necessary to protect myself, Officer Hernandez, and the bystanders from the danger that Plaintiff posed, as we had reason to believe that he was armed at the time of his arrest.  The force used was also that which was reasonably necessary to overcome

the resistance that Plaintiff was putting up, and the force used was in no way
excessive.

*Id.* at 3 ¶ 7.

### 3. The video evidence.

#### a. Plaintiff's arrest – Officer Hernandez.

Officer Hernandez's body camera footage (Doc. No. 22-1, Exhibit A) spans just under 13
minutes of video, with sound.  Approximately one minute into the video, Officer Hernandez
encounters Plaintiff and tells him to "come here."  Plaintiff is immediately uncooperative, and
answers "No.  Hey, get away from me, man."  Plaintiff tells Officer Hernandez that he does not
have any identification with him.  Officer Hernandez then tells Plaintiff that his reason for
addressing Plaintiff was that Plaintiff was walking in the middle of the road.

Officer Hernandez asks Plaintiff whether he has any weapons, and Plaintiff answers that
he does not.  Officer Hernandez then instructs Plaintiff to turn his pockets inside out.  Plaintiff
protests that he does not have a weapon, but turns out his pockets.  Officer Hernandez again asks
if Plaintiff is carrying a gun, and Plaintiff denies having one.  Officer Hernandez asks Plaintiff
why he has bullets.  Plaintiff then calls Officer Hernandez by name ("Hernandez") and tells
Officer Hernandez to get away from him and starts to walk away.  Officer Hernandez tells
Plaintiff to "chill out," repeats the reason he had addressed Plaintiff, and tells Plaintiff that he
will be patting Plaintiff down.  At this point, the video is at approximately the two-minute mark.

Plaintiff again attempts to walk away from Officer Hernandez and claims that Officer
Hernandez is harassing him.  Officer Hernandez instructs Plaintiff multiple times to "stop," but
Plaintiff continues to try to walk away from him.  Officer Hernandez then requests backup.

Officer Hernandez then instructs Plaintiff to walk to the front of his patrol car, but Plaintiff refuses.  Officer Hernandez repeats that Plaintiff had had a bullet in his pocket, but Plaintiff responds "Bro, I'm not gonna fucking go."  Officer Hernandez again orders Plaintiff to go to the front of the patrol car, but Plaintiff again refuses.  Officer Hernandez tells Plaintiff not to reach for his pockets and to "chill out."  At this point, three minutes and 18 seconds into the video, the first backup patrol car arrives (Officer Rodriguez).

Officer Hernandez again tells Plaintiff that he will not simply walk away from Officer Hernandez.  Plaintiff responds "Yes I am, bro," and continues to try to walk away from Officer Hernandez.  Officer Hernandez repeats that he will pat down Plaintiff.  Plaintiff responds by turning and attempting to walk away from Officer Hernandez and Officer Rodriguez.  Officer Hernandez then grabs Plaintiff's arm to keep him from walking away.  Plaintiff pulls his arm away and tries to flee from the officers.  Officer Hernandez follows, again tells Plaintiff to "chill out" and warns Plaintiff that he will be tased if he does not comply.  Plaintiff responds by telling Officer Hernandez to "just get away from me, bro.  That's all you gotta do is get away from me."  Officer Hernandez grabs Plaintiff again by the shirt, and Plaintiff falls to the ground as he tries to get away, and Officer Hernandez is positioned above him.

Officer Hernandez and Officer Rodriguez then attempt to handcuff Plaintiff.  Officer Hernandez tells Officer Rodriguez that Plaintiff had a bullet in his pocket.  Officer Rodriguez is heard telling Plaintiff "You're going to hurt yourself" because he is continuing to struggle, and instructs Plaintiff to give her his hands.  Plaintiff replies "No.  I'm not giving you my hands."  Officer Rodriguez repeats the instruction several more times, calling Plaintiff by name ("Ricky G"), but Plaintiff continues to refuse to give the officers his hands to be cuffed.

11 / 30

Approximately five minutes into the video, Plaintiff says "Get off of me, you're hurting my back." Officer Hernandez again instructs Plaintiff to give him his hand, but Plaintiff again refuses. Officer Hernandez repeats the instruction, but Plaintiff does not comply. Plaintiff tells Officer Hernandez to get off of him, but Officer Rodriguez says "You're not cooperating."

At this point, about five minutes and 35 seconds into the video, bystanders are heard nearby. Officer Rodriguez, apparently answering something said by a bystander, then says "He's not cooperating, so. If he cooperates, he won't be hurting." Both Officer Rodriguez and Officer Hernandez again instruct Plaintiff to give his other hand for cuffing, but Plaintiff responds "No, I'm not giving you my fucking hand, bro!" Officer Rodriguez tells the bystanders: "We'll get with you in a bit. Stay over there."

Plaintiff, still on the ground with Officer Hernandez over him, demands to know why Officer Hernandez had addressed him. Officer Hernandez repeats that Plaintiff had been walking in the middle of the road. Plaintiff then yells "Get the fuck off my back!" Officer Hernandez again repeats his instruction that Plaintiff give his other hand to be cuffed, but Plaintiff again refuses. Plaintiff tells Officer Hernandez "Bro, get off me, bro, you're hurting me," but again refuses, several more times, to give his other hand.

Six minutes and 42 seconds into the video, Plaintiff begins to struggle underneath Officer Hernandez. Officer Hernandez again tells Plaintiff to give his other arm for cuffing, but Plaintiff continues to refuse. Officer Hernandez finally is able to roll Plaintiff to one side so that his other hand can be cuffed. Plaintiff is heard grunting, and Officer Rodriguez tells Plaintiff to "stop. Stop kicking." Officer Hernandez gets Plaintiff into a sitting position for cuffing about eight minutes into the video and begins to search him. Despite being handcuffed, Plaintiff continues to struggle against being searched. Nine minutes and ten seconds into the video, Officer

Hernandez finds a gun in Plaintiff's waistband. He asks: "Is that a gun, dude? Is that a gun?" Plaintiff does not answer. Officer Hernandez then radios that he has found a gun on Plaintiff.[5]

Plaintiff continues to struggle, and Officer Hernandez warns Plaintiff that he will hurt himself. After taking Plaintiff's gun, Officer Hernandez then instructs Plaintiff to get up. Plaintiff again resists, so Officer Hernandez tries to lift Plaintiff from under Plaintiff's arm. Plaintiff continues to struggle: "I said you hurt me. Get the fuck off me! Bitch. No, I'm not gonna get up." Plaintiff, still seated, says that his back is hurting. Officer Hernandez says "Get up." Plaintiff replies: "No. Fuck you." At about the ten-minute mark of the video, as Officer Hernandez attempts to loop his hand under Plaintiff's arm to lift him, Plaintiff asks "Did you just punch me in my face, pussy?" Officer Hernandez responds "I didn't punch you." Plaintiff says "You punched me, motherfucker! Get off me!" This is the only point in the video where there is any mention of punching. The video does not show the throwing or landing of any punch.

Officer Hernandez again instructs Plaintiff to get up, but Plaintiff does not comply. Two other unknown officers then walk up and lift Plaintiff from under Plaintiff's arm. Plaintiff resists these officers as well and falls back to the ground, saying "I said to get the fuck off me, man, get off me!," but the officers finally subdue him on the ground. Officer Hernandez says "somebody bring a car."

Ten minutes and 38 seconds into the video, Plaintiff says "my fucking spine" as one of the other officers. Officer Hernandez then tells the other officers "Yeah, he's got a back injury, guys, so watch out, man." Plaintiff continues to struggle as the officers attempt to restrain him. Eleven minutes and 15 seconds into the video, Officer Hernandez stands up and a patrol car is

---

[5] In his arrest report, Officer Hernandez states that while he was attempting to handcuff Plaintiff, Plaintiff "began reaching for his left side, near his underarm." (Doc. No. 22-2, p. 5.) Officer Hernandez located the gun near the left side of Plaintiff's underarm. *Id.*

seen in the video.  The other officers tell Plaintiff that "we're gonna stand you up on three."

Plaintiff answers "No, you're not.  [unintelligible] my fuckin' spine, bro!"  The other officers lift

Plaintiff up by the arms, and Plaintiff again struggles and yells "Get the fuck off me, you stupid

motherfuckers!"  The other officers lead Plaintiff to the patrol car's rear left door to place him

inside, but Plaintiff resists getting into the car.  Someone is heard instructing an officer to go

around to the other side of the car as Plaintiff continues to struggle.  Plaintiff is finally pushed

into the rear seat as another officer apparently pulls his arms from the other side of the car.

Officer Hernandez tells Plaintiff "watch your foot, bro," and then closes the patrol car's door.

The video then ends.

### b. *Plaintiff's arrest – Officer Rodriguez.*

To the extent Officer Rodriguez's body camera footage reveals additional facts beyond

those captured in Officer Hernandez's footage, those facts are discussed here.

Officer Rodriguez's body camera video begins with her driving to the scene of Plaintiff's

arrest.  When she arrives, Plaintiff is attempting to walk away from Officer Hernandez and is

arguing with him.  Plaintiff says to Officer Hernandez "I didn't have shit on me, bro.  I had a

bullet, bro."  Officer Hernandez then tells Plaintiff that he will be patting Plaintiff down, but

Plaintiff backs away and resists.  Officer Rodriguez addresses Plaintiff by name and says "Ricky

G, let him, so we can be done."

Plaintiff pulls away from Officer Hernandez and attempts to flee down the street.  Officer

Hernandez pursues him and is seen pulling out his taser.  Officer Hernandez then warns Plaintiff

that he will be tased if he does not comply.  Officer Rodriguez twice says "Ricky G, stop," but

Plaintiff continues to back away from both officers.  Officer Hernandez then grabs Plaintiff by

the shirt, but Plaintiff tries to twist away. Officer Hernandez grabs hold of Plaintiff's arm and wrestles him to the ground. Officer Rodriguez then cuffs Plaintiff's right hand.

The encounter continues as recounted above in Officer Hernandez's video. Officer Rodriguez instructs Plaintiff to turn over so that his left hand can be cuffed, but Plaintiff refuses. After Officer Hernandez gets Plaintiff up into a sitting position, Officer Rodriguez is able to cuff Plaintiff's other hand. Officer Rodriguez then radios that Plaintiff is in custody. Officer Hernandez then searches the struggling Plaintiff and finds the gun. Officer Hernandez hands the gun to Officer Rodriguez, who takes it to her patrol vehicle. As she does this, the other officers arrive and are seen walking toward where Officer Hernandez and Plaintiff are located.

Officer Rodriguez secures the gun in her patrol car and then backs up the car to the location of Plaintiff and the other officers. She opens the back left door of the car so that Plaintiff can be placed inside. Officer Rodriguez does not participate in moving Plaintiff to the car or placing him inside: she holds a flashlight to provide light for the other officers.

As the other officers try to place Plaintiff in the back seat, Plaintiff is seen looping his leg around an officer's leg to prevent them from doing so. Plaintiff is finally placed into the back seat. Officer Rodriguez then gets into the patrol car and drives Plaintiff to the jail. (The transport is discussed next.) Officer Rodriguez does not punch Plaintiff at any point during the entire encounter, nor does she ever grab Plaintiff's throat.

### c. *Plaintiff's transport after arrest.*

Three sets of video footage depict Plaintiff's short trip from the arrest scene to the San Patricio County Jail. One video shows Plaintiff in the back seat of Officer Rodriguez's patrol vehicle. In the soundless video, which lasts one minute and four seconds, Plaintiff moves a bit

with the vehicle's movement, but is not jostled or thrown from his seat. (Doc. No. 22-1, Exhibit G.)

A second video, which lasts two minutes and 41 seconds and is also soundless, is the dash camera from Officer Rodriguez's patrol vehicle. (Doc. No. 22-1, Exhibit H.) The portion of the video depicting the trip (which lasts about one minute and 41 seconds)[6] is unremarkable, and does not depict any sudden acceleration or sudden braking during the brief journey. Officer Rodriguez stops at the one stop sign along the way, but her braking is gradual, not sudden, and so is her acceleration thereafter. The video includes a notation of the vehicle's speed. The speed indicator shows that Officer Rodriguez's braking was gradual as she approached the stop sign, as was her acceleration as the vehicle resumed forward movement. Officer Rodriguez also slowed gradually as she approached and crossed the railroad tracks. The vehicle reaches its highest speed on the long, straight, smooth road at the conclusion of the trip – during this time, its top speed was 87 kilometers per hour (about 54 miles per hour). Acceleration to this point was gradual, not sudden, and there were no bumps along this portion of the trip. Braking was likewise gradual.

Officer Rodriguez's body camera footage (Doc. No. 22-1, Exhibit B) also includes her transport of Plaintiff to the jail. That video does have sound, and is consistent with the other videos. During the trip, there is no significant jostling or sudden braking or acceleration, and Plaintiff makes no sound except for a grunt as the patrol vehicle enters the jail's driveway at the end of the trip.

---

[6] The remainder of the video shows the arrived patrol vehicle parked in the jail's garage.

### F. *The defendants' motion is treated as one for summary judgment.*

The defendants style their motion as a "motion to dismiss." (Doc. No. 22, p. 1.) Somewhat confusingly, however, at the end of their motion they ask the Court to "grant this motion for summary judgment…." *Id.* at 14. The defendants also submit evidence for the Court's consideration in resolving the motion. (Doc. Nos. 22-1 through 22-5.) At the conclusion of their motion, however, they ask the Court to "grant this motion for summary judgment.) (Doc. No. 22, p. 14.) They also argue that the Court must "'assign greater weight, even at the summary judgment stage, to the video recording taken at the scene.'" *Id.* at 10 (citing *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (as here, a Fourth Amendment excessive force case in the posture of summary judgment examining qualified immunity)).

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), a court may usually rely only on the complaint and its proper attachments. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); Fed. R. Civ. P. 12(d). If the court considers any extrinsic evidence, however, it at least implicitly converts the motion into one for summary judgment. *See Hodge v. Engleman*, 90 F.4th 840, 844-45 (5th Cir. 2024). If the court intends to treat a motion to dismiss or a motion for judgment on the pleadings as a motion for summary judgment, the court must give the parties a reasonable opportunity to present all the material that is pertinent to the motion. Fed. R. Civ. P. 12(d).

Here, Officers Hernandez and Rodriguez have submitted evidence with their June 28 motion that exceeds that attached to Plaintiff's complaint, and seek the Court's consideration of that evidence in resolving their qualified immunity motion. It is therefore appropriate to treat the defendants' motion as one for summary judgment. Despite the defendants' labeling of their

motion as one for dismissal, the Court understands defendants' intent to be the securing of summary judgment.

A court is not required to advise either party of its intention to convert a dismissal motion into one for summary judgment. *See Hodge*, 90 F.4th at 845 (citing *Holguin v. U.S. Dep't of Army*, 89 F.3d 1337, 1996 WL 556767, at *2 (5th Cir. 1996) (per curiam) (table) (unpublished)). But the non-moving party must have at least ten days' notice in order to submit its own evidence. *See id.* "That ten-day 'period begins running when the non-movant is first put on notice that, based on its acceptance of evidence outside the pleadings, the court *could* convert the Rule 12(b)(6) motion into a summary judgment.'" *Id.* (emphasis in original).

In this case, consistent with Rule 12(d) and *Holguin*, the Court has already provided the parties with notice that it is construing the defendants' dismissal motion as one for summary judgment. In an order issued on July 5, 2024, the Court characterized the defendants' motion as "a joint motion for summary judgment on the basis of qualified immunity" and observed that exhibits – including video footage – had been submitted along with the motion. (Doc. No. 23, p. 1.) The Court granted Plaintiff additional time (until July 31) to respond to that summary judgment motion, to ensure that Plaintiff was afforded the opportunity to view the video evidence. *Id.* at 1-2. This meets *Holguin*'s ten-day standard.

### G. Legal standards.

#### 1. Summary judgment.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

Courts must draw all justifiable inferences in favor of the party opposing the motion, and resolve any disputed material facts in the nonmovant's favor. *Anderson*, 477 U.S. at 255; *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). Thus, the moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). "The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports his claim." *Acosta v. Williamson Cnty., Tex.*, No. 1:21-CV-00615-DII, 2023 WL 5352324, at *4 (W.D. Tex. Aug. 21, 2023), *adopted*, 2023 WL 6612521 (W.D. Tex. Oct. 10, 2023), *aff'd*, No. 23-50777, 2024 WL 3833303 (5th Cir. Aug. 15, 2024) (citing *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006)). There is no genuine dispute for trial when "the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If the nonmovant fails to sufficiently raise a genuine factual issue essential to his case and on which he bears the burden of proof at trial, and if no reasonable juror could find for the nonmovant, then summary judgment

must be granted. *Celotex*, 477 U.S. at 322-23; *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

In making this determination, courts must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file. *Caboni*, 278 F.3d at 451. Affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4).

Summary judgment is proper only if no genuine issue of material fact exists. As discussed above, a court considering a summary judgment motion must draw all justifiable inferences in favor of the party opposing the motion. *Caboni*, 278 F.3d at 451. But if a party's version of events is "blatantly contradicted" by the record, such as by a video recording, such that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *See McDowell v. Wal-Mart Stores, Inc.*, 811 F. App'x 881, 883 (5th Cir. 2020) (citing *Scott*, 550 U.S. at 380); *see also Hodge*, 90 F.4th at 846 ("In sum, a court may rely on video evidence to resolve any claimed genuine disputes of material fact and rule on summary judgment."). In that situation, courts are to reject "a plaintiff's description of the facts where the record discredits that description [and] instead consider 'the facts in the light depicted by the videotape.'" *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott*, 550 U.S. at 381).

### 2. *Qualified immunity.*

The doctrine of qualified immunity protects government officials "sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A qualified immunity defense "alters the usual summary judgment burden of proof." *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 307 (5th Cir. 2024) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).  "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017).

Qualified immunity is a generous shield: it provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Thus, a government official can be held personally liable for monetary damages only if the official's particular conduct: (1) "violated a statutory or constitutional right," and (2) "the right was 'clearly established' at the time of the violation," such that the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *Ford*, 102 F.4th at 307 (quoting *al-Kidd*, 563 U.S. at 735 (quoting *Harlow*, 457 U.S. at 818)); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "If the plaintiff fails at either step, the federal court can grant qualified immunity by addressing either step or both of them." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).

A government official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *al-Kidd*, 563 U.S. at 741

(citing *Anderson*, 483 U.S. at 640 (cleaned up)). A binding court case "directly on point" is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Malley*, 475 U.S. at 341. "Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather the inquiry must focus on whether a right is clearly established as to the specific facts of the case." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citing *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004)). Absent controlling authority, there must be a "robust 'consensus of cases of persuasive authority.'" *al-Kidd*, 563 U.S. at 741 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). And the controlling decision or consensus must be with regard to the official's "*particular* conduct," described with specificity. *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1166 (5th Cir. 2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (emphasis in original)). The inquiry is judged against the backdrop of the law at the time of the conduct. *Morgan v. Chapman*, No. 6:17-CV-00004, 2022 WL 4367057, at *8 (S.D. Tex. Sept. 20, 2022) (Tipton, J.) (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

### 3. 42 U.S.C. § 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004); *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). A defendant acts under color of state law if he or she misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

### *4. Excessive force and the Fourth Amendment.*

To establish a claim of excessive force under the Fourth Amendment, a plaintiff must demonstrate (1) injury (2) which resulted directly and only from a use of force that was clearly excessive and (3) the excessiveness of which was clearly unreasonable.  *See Ramirez v. Killian*, 113 F.4th 415, 424 (5th Cir. 2024) (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)); *Betts*, 22 F.4th at 582 (citing *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020).  To determine whether a use of force was reasonable under the Fourth Amendment, courts apply the so-called "*Graham* factors."  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  *Graham* explains that the reasonableness test's "proper application requires careful attention to the facts and circumstances of each particular case, including" (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)); *see also Batyukova v. Doege*, 994 F.3d 717, 725 (5th Cir. 2021).  The central question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137–39 (1978)).

Reviewing courts are also to consider the relationship between the need for force and the amount of force used.  *See Joseph*, 981 F.3d at 332.  Measured and ascending actions are properly used if they correspond to an uncooperative arrestee's escalating verbal and physical resistance.  *Betts*, 22 F.4th at 582 (citing *Joseph*, 981 F.3d at 332-33; *Poole v. City of Shreveport*,

691 F.3d 624, 629 (5th Cir. 2012)); *Livingston v. Texas*, 632 F. Supp. 3d 711, 725 (S.D. Tex. 2022) (Tipton, J.).

### H.  The district court should treat the defendants' motion as unopposed, and should decide the motion on the papers before it.

Plaintiff failed to respond to the defendants' motion.  Under this Court's local rules, that failure can be construed as a lack of opposition to the motion.  *See* Local Rule 7.4.  But a plaintiff's claims may not be dismissed with prejudice based solely on such a lack of response. *See Davis v. ComputerShare Loan Servs.*, No. 4:23-CV-1542, 2023 WL 9005670, at *2 (S.D. Tex. Nov. 8, 2023) (Bryan, M.J.), *adopted*, 2023 WL 9007275 (S.D. Tex. Dec. 27, 2023) (citing *Hansen v. Protective Life Ins. Co.*, 642 F. Supp. 3d 587, 597 (S.D. Tex. 2022) (Lake, J.).  This is also true in the context of a motion seeking summary judgment based on qualified immunity. *See Roland v. Nacogdoches Cnty.*, No. 9:21-CV-254, 2022 WL 17252197, at *5 (E.D. Tex. Nov. 23, 2022) (courts may not grant summary judgment by default even when qualified immunity is invoked).  Instead, a proper sanction for a failure to respond to a dispositive motion is for the court to decide the motion on the papers before it.  *Hansen*, 642 F. Supp. 3d at 597 (citing *Ramsay v. Bailey*, 531 F.2d 706, 709 n.2 (5th Cir. 1976)).  In this case, the district court should not simply grant the summary judgment motion merely because Plaintiff has failed to respond. The district court should, however, decide the motion based solely on the papers that have been submitted.

### I.  Discussion.

#### 1.  The defendants' summary judgment evidence is competent for consideration.

Because Plaintiff did not respond to the defendants' summary judgment motion, he likewise did not object to the evidence they submitted in support of that motion.  But even laying

aside the absence of objection, the Court finds that the submitted evidence is competent for consideration.

When considering a summary judgment motion, a court seeks "to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant – without imposing on parties the time and expense it takes to authenticate everything in the record." *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017).  Materials cited to support or dispute a fact therefore need only be *capable* of being presented in a form that would be admissible in evidence.  *See LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original) (quoting Fed. R. Civ. P. 56(c)(2)).  As applicable here, body camera and dash camera footage, arrest reports, and affidavits have all been found to be competent summary judgment evidence.  *E.g.*, *Stephen v. Palestine Police Dep't*, No. 6:18cv652, 2020 WL 2739887, at *6 (E.D. Tex. Jan. 27, 2020), *adopted*, 2020 WL 2739606 (E.D. Tex. May 26, 2020); *Renfroe v. Parker*, 974 F.3d 594, 596-97 (5th Cir. 2020).  In this case, all are capable of being authenticated and presented as admissible evidence at trial.  The undersigned therefore considers that evidence in assessing the defendants' summary judgment motion.[7]

## 2. *Officers Hernandez and Rodriguez are entitled to qualified immunity.*

The defendants' summary judgment evidence is uncontroverted, because Plaintiff failed to respond to their motion or to provide any summary judgment evidence of his own.  The undersigned therefore accepts as uncontroverted the evidence contained in the affidavits submitted by Officers Hernandez and Rodriguez, as well as in the unchallenged video evidence –

---

[7] It is unclear what probative value Officer Rodriguez's arrest report carries.  That report describes her arrest of Plaintiff on August 12, 2023 – some 11 days after the alleged excessive force incident, and does not refer to the August 1 excessive force incident at issue in this case.  *See* Doc. No. 22-5.

the body camera footage from Officers Hernandez and Rodriguez and the videos of Plaintiff's transport to the jail. The relevant question, then, is whether the facts presented by the defendants create an appropriate basis to enter summary judgment against Plaintiff. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); Fed. R. Civ. P.56(e)(2). They do.

To prevail in this case, Plaintiff would ultimately need to prove that he suffered an injury that resulted directly and only from the officers' clearly excessive and objectively unreasonable use of force. *See Betts*, 22 F.4th at 582. But Plaintiff must first clear a different hurdle: the officers' qualified immunity. In cases involving Fourth Amendment allegations of excessive force, courts are to measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts. *See Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Leadon v. Collier*, No. 6:19cv364, 2022 WL 453546, at *8 (E.D. Tex. Jan. 5, 2022), *adopted*, 2022 WL 446759 (E.D. Tex. Feb. 12, 2022) (citing *Griggs*, 841 F.3d at 313).

Plaintiff bears the burden of demonstrating that the officers are not entitled to qualified immunity. *See Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014). To do this, he must demonstrate that the law was sufficiently clear at the time of the alleged use of force that every reasonable officer would have understood that what he or she was doing violated Plaintiff's right to be free from the excessive use of force. Plaintiff's required showing could be made in one of two ways. First, he could either identify a case or a body of relevant case law in which an officer acting under similar circumstances was held to have violated the constitution. *See Batyukova*, 994 F.3d at 726 (citing *Joseph*, 981 F.3d at 330). Or Plaintiff could demonstrate that this case is one of those rare obvious cases where the unlawfulness of the officers' conduct is sufficiently

clear even though existing precedent does not address similar circumstances.  *See id.* (citing *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)).  In this case, Plaintiff has not responded to the summary judgment motion, and thus he has done nothing to carry his burden.  The Court's own review of the evidence, however, indicates that the officers are entitled to qualified immunity.

Assuming without deciding that Plaintiff suffered a greater-than-*de minimis* injury as a result of the force employed during his arrest,[8] the remaining factors indicate that the force was not clearly excessive or clearly unreasonable.  Through the uncontroverted evidence, Officers Hernandez and Rodriguez have established that Plaintiff actively and consistently resisted both officers, both verbally and physically, throughout the encounter that night.  Although the offense for which Officer Hernandez addressed Plaintiff appears to have been minor (walking in the middle of the road),[9] other *Graham* factors prior to the use of force reasonably caused Officer Hernandez to believe that Plaintiff might pose a danger to Officer Hernandez.  Most significantly, Plaintiff was carrying a bullet in his pocket, leading Officer Hernandez to suspect that he might have a firearm as well.

Additionally, the record is replete with evidence that Plaintiff actively resisted officers throughout the entire encounter.  First, Plaintiff's own response to the Court's questionnaire acknowledges his resistance.  Asked whether he was resisting the officers, Plaintiff stated "Yes I resisted the search ….  As far as physical I just kept moving so he wouldn't put his hands on me

---

[8]  *See Sauceda v. City of San Benito, Tex.*, 78 F.4th 174, 189 (5th Cir. 2023).

[9]  *See* Tex. Transp. Code §§ 552.006(a)-(b) (pedestrians must walk on the sidewalk if one is provided or, if no sidewalk is provided, on the left side of the roadway or the shoulder of the highway facing oncoming traffic).  This is a misdemeanor offense.  *See* Tex. Transp. Code §§ 542.301(a)-(b); *Rusanowsky v. City of Dallas*, No. 3:22-CV-01132, 2024 WL 922766, at *4 (N.D. Tex. Mar. 4, 2024).

cause I was in fear." (Doc. No. 10, p. 3 ¶ 9(d).) Plaintiff also stated that he "didn't want to get in squad car, I put my leg in rear wheel fender so they couldn't get me in." *Id.* at 4 ¶ 9(f). The other uncontroverted evidence indicates that Plaintiff refused Officer Hernandez's order to submit to a pat down for weapons, tried to walk away from Officer Hernandez and Officer Rodriguez, struggled with Officer Hernandez to avoid being patted down, refused to present his second hand for handcuffing when directed to do so, and struggled against Officer Hernandez and Officer Rodriguez when they tried to cuff him. Plaintiff also physically resisted being placed into the patrol car for transport. Plaintiff was adversarial and noncompliant, and attempted to flee. This evidence is sufficient to find that Plaintiff was actively resisting arrest. *See Bueler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022); *Batyukova*, 994 F.3d at 727. It does not appear that Officer Rodriguez used any force at all, and Officer Hernandez used force only after Plaintiff refused to comply and attempted to flee from him. .

Meanwhile, the quantum of force used by Officer Hernandez was rather minor. At most, Officer Hernandez eventually had to wrestle Plaintiff to the ground and hold him there in order to pat him down for weapons, after repeatedly instructing the still-struggling Plaintiff to submit to the pat down. This was a measured and ascending response to Plaintiff's noncompliance. *Cf. Solis v. Serrett*, 31 F.4th 975, 983 (5th Cir. 2022); *Buehler*, 27 F.4th at 984-85. But that was all. No blows were struck. Officer Hernandez did not tase Plaintiff (despite having threatened to do so), and the uncontroverted video shows that neither Officer Hernandez nor Officer Rodriguez ever punched Plaintiff. The video shows that Officer Rodriguez never grabbed Plaintiff by the throat as he alleges. Officer Hernandez even warned the other officers to "watch out" – to be careful with Plaintiff back because he had a back injury; this warning indicates Officer Hernandez's desire that Plaintiff not suffer injury from the force being used. Finally, review of

the video footage indicates that Officer Rodriguez's driving caused no injury to Plaintiff – the manner of driving was reasonable from an objective standpoint and not indicative of an application of force. Overall, the amount of force used on Plaintiff was not clearly excessive given the circumstances.

The undersigned discerns no excessive force used by either Officer Hernandez or Officer Rodriguez, and thus that they did not violate the Fourth Amendment. The undersigned further concludes that there is no controlling case or robust consensus of persuasive authority indicating that the quantum of force the officers did use violated Plaintiff's Fourth Amendment rights in the face of his active and ongoing resistance and the officers' suspicion that Plaintiff might be armed. *Cf. Buehler*, 27 F.4th at 985. Nor is this case one where the officers' use of force was so obviously and clearly unreasonable as to satisfy the *Wesby* standard. Officers Hernandez and Rodriguez are therefore entitled to qualified immunity and summary judgment.

### J. Conclusion and recommendation.

The district court should GRANT Officer Hernandez's and Officer Rodriguez's motion for summary judgment (Doc. No. 22) and DISMISS Plaintiff's lawsuit with prejudice.

### K. Notice.

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within 14 days after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), and General Order No. 2002-13, United States District Court for the Southern District of Texas. A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy

shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

SIGNED on September 27, 2024.

MITCHEL NEUROCK
United States Magistrate Judge